<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                    :
CONRAD P. SEGHERS, et al.,          :    CIVIL ACTION NO. 06-628 (MLC)
                                    :
      Plaintiffs,                   :    MEMORANDUM OPINION
                                    :
      v.                            :
                                    :
EXECUTIVE RISK INDEMNITY,           :
INC.,                               :
                                    :
      Defendant.                    :
                                    :
```

<u>**COOPER, District Judge**</u>

The plaintiffs, Conrad P. Seghers ("Seghers"), Winifred B. Seghers ("Winifred Seghers"), Integral Hedging Offshore, Ltd. ("IHO"), Exponential Returns, L.P. ("ER"), and Exponential Returns Management, L.P. ("ERM") (collectively, "plaintiffs") commenced this action for breach of contract and malicious bad faith denial of insurance coverage against the defendant, Executive Risk Indemnity, Inc. ("Executive Risk"). (Compl., at ¶ 1.) Executive Risk moves to transfer this action to the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § ("Section") 1404(a). (Dkt. entry no. 15.) For the reasons stated herein, the Court will grant the motion.

**BACKGROUND**

**I.   The Parties**

Seghers and his wife, Winifred Seghers, reside in Texas. (Compl., at ¶ 9; Def. Br., at 3.) Seghers is a member, director,

officer, and limited and managing partner of ER.  (Compl., at ¶ 9.)  Seghers is also the sole director of IHO.  (Id.)  ER and ERM are Texas limited partnerships that each has its principal place of business in Texas.  (Id. at ¶¶ 12-13; Def. Br., at 3.)  IHO is an international company duly organized and existing under the laws of the British Virgin Islands ("BVI").  (Compl., at ¶ 11; Def. Br., at 3.)  IHO has a principal place of business in both the BVI and New York City.  (Id.)  Executive Risk is a Delaware corporation with its principal place of business in Warren, New Jersey.  (Compl., at ¶ 14.)

## II.  Actions Underlying Plaintiffs' Insurance Coverage Claims

Plaintiffs, among others, are insureds under an insurance policy, issued by Executive Risk, entitled "BermudaPLUS Global Financial Service/Investment Company Professional and Management Liability Policy No. 8165-88711" (the "Policy").  (Id. at ¶ 1; Def. Br., at 4.)  The Policy was underwritten at Executive Risk's offices in Simsbury, Connecticut and was issued to Winchester Global Trust Co., Ltd., the named policyholder, in Bermuda through an insurance broker in London, England.  (Def. Br., at 4.)  The Policy term was March 31, 2000 to March 31, 2003.  (Compl., at ¶ 23.)  The Policy contained three separate coverage parts, including the "Mutual Fund Professional Liability, Including Directors, Officers and Trustees Liability Coverage Part" (the "Mutual Fund Coverage Part").  (Id. at ¶ 20.)  The

2

Mutual Fund Coverage Part required Executive Risk to "pay on behalf of the Insured Loss from Claims first made against the Insured during the Policy Period or, if applicable, the Extended Reporting Period, for Wrongful Acts." (Id. at ¶ 22.) The maximum amount of coverage the insureds were entitled to receive under the Mutual Fund Coverage Part was $5,000,000 "(inclusive of Defense Expenses) for each Claim." (Id. at ¶ 28; Def. Br., at 6.) However, the maximum aggregate amount of coverage the insureds were entitled to receive for "all Claims under the Policy" was $25,000,000. (Compl., at ¶ 29; Def. Br., at 6.)

The Policy defined a "Claim" as:

(a) any civil proceeding in a court of law or equity,

(b) any criminal proceeding in a court of law,

(c) any administrative or regulatory proceeding, commenced by the filing of a notice of charges, formal investigative order or similar document,

(d) a written demand or notice to an Insured describing circumstances that are likely to give rise to the commencement against an Insured of any proceeding described in clause (a), (b) or (c) above.

(Compl., at ¶ 42.) Also, the Policy defined "Related Claims" as

all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

(Id. at ¶ 44.) Thus, the maximum aggregate amount of coverage the insureds were entitled to receive under the Policy for

Related Claims was $5,000,000 because such claims essentially constitute a single Claim.

### A.    The AIC Action

The Art Institute of Chicago brought an action in Texas state court in December 2001 against Seghers, IHO, and several other hedge funds (the "nonparty hedge funds"), which are also insureds under the Policy (the "AIC Action").  (Id. at ¶ 46; Def. Br., at 5.)  The Art Institute of Chicago alleged that it invested more than $40 million in funds Seghers controlled and its investment lost over 90 percent of its value because Seghers and the other AIC Action defendants (1) failed to invest the money in accordance with promised investment and trading strategies, (2) misrepresented the funds' value, (3) fraudulently overbilled for fees and expenses, and (4) caused the investment "to be funneled through various accounts, in order to steal these funds".  (Def. Br., at 5-6.)  The Art Institute of Chicago asserted various claims against Seghers and the other AIC Action defendants, including securities fraud, violations of the Texas Securities Act, and breach of fiduciary duty.  (Id. at 6.)

### B.    The Receiver Actions

The Texas state court, in the AIC Action, placed the nonparty hedge funds into receivership and appointed Daniel Jackson, a Texas resident, as the receiver ("Receiver").  (Id.) Thereafter, the Receiver filed a third party petition and plea in

4

intervention in the AIC Action, and also commenced additional
actions in Texas, New York, and California against Seghers,
Winifred Seghers, ERM, as the general partner of ER, and others
(the "Receiver Actions").  (Id.; Compl., at ¶ 51.)  The Receiver
alleged that those parties breached their fiduciary duties, made
misleading statements, and committed acts, errors, and omissions
in connection with the transfer of certain hedge fund and mutual
fund assets after those funds had incurred losses.  (Compl., at ¶
52.)  The Receiver requested both damages and the freezing and
turnover of assets belonging to the funds.  (Id. at ¶ 51; Def.
Br., at 6.)  In June 2005, Seghers, Winifred Seghers, and ERM
entered into a settlement agreement with the Receiver pursuant to
which Seghers was designated as a paid consultant for the
Receiver and ERM was required to pay at least $350,000 of its own
assets to the Receiver.  (Compl., at ¶ 55.)

    **C.   The SEC Actions**

    The Securities and Exchange Commission ("SEC") also
commenced actions against Seghers and several of the nonparty
hedge funds in both the Northern District of Texas and the
Central District of California (the "SEC Actions") alleging that
they violated the Securities Exchange Act of 1934 and the
Investment Company Act of 1940.  (Id. at ¶¶ 56-57.)
Specifically, the SEC claimed that Seghers (1) overstated to
investors the value of their investments and misrepresented the

rates of return with respect to certain of the nonparty hedge funds, (2) offered and sold securities without filing a registration statement of such offerings with the SEC, and (3) violated the Investment Advisers Act.  (Id. at ¶ 57.)  A jury rendered a verdict in the SEC Action pending in the Northern District of Texas and found Seghers liable for securities fraud. (Def. Br., at 10.)

**D.    The NFA Action**

The National Futures Association ("NFA") commenced an administrative proceeding against Seghers and a nonparty hedge fund (the "NFA Action") claiming that they violated certain NFA compliance rules.  (Compl., at ¶ 61.)  The NFA also claimed that Seghers, who controls the nonparty hedge fund, failed to demonstrate the basis and accuracy of the nonparty hedge fund's advertised performance results.  (Id.)  Seghers and the nonparty hedge fund ultimately settled with the NFA.  (Id.)

**E.    The BVI Actions**

The Attorney General for the BVI alleged that Seghers and others illegally transferred money from IHO and other funds to the BVI.  (Id. at ¶ 64.)  As a result, the Eastern Caribbean Supreme Court brought an action against Seghers asserting violations of BVI laws (the "BVI Action").  (Id. at ¶¶ 63, 65.) Moreover, the BVI's Financial Services Commission also commenced an action against Seghers, IHO, and a nonparty hedge fund (the

6

"BVI FSC Action") alleging that they (1) illegally transferred
ill-gotten proceeds to BVI banks, and (2) filed inappropriate BVI
registration papers for IHO and the nonparty hedge fund.  (<u>Id.</u> at
¶ 67.)  The BVI Financial Services Commission requested and
obtained a freeze order restraining IHO and other parties from
dealing with IHO's assets in the BVI, and this order ultimately
destroyed IHO.  (<u>Id.</u> at ¶ 68.)

### F.   The Criminal Investigations

Several parties are also investigating plaintiffs' conduct
and activities for potential criminal violations, including the
United States Attorney for the Northern District of Texas, the
United States Attorney for the Northern District of Illinois, the
Attorney General for the BVI, and the White Collar Crime
Investigation Team, which is leading investigations in the
Federal Bureau of Investigation, the Cayman Islands, and the BVI
(collectively, the "Criminal Investigations").  (<u>Id.</u> at ¶ 70.)
The basis of these investigations are allegations that
plaintiffs, particularly Seghers, employed an intentionally
deceptive amortization methodology and committed, <u>inter</u> <u>alia</u>,
mutual fund registration fraud, wire fraud, mail fraud, and
forgery.  (<u>Id.</u> at ¶¶ 71, 73, 75, 77.)

### III. The Prior Coverage Action

The Receiver filed a third-party petition in the AIC Action
claiming that Executive Risk improperly failed to defend and

indemnify the nonparty hedge funds, which are insureds under the Policy. (Id. at ¶ 79.)  In response, Executive Risk commenced an action in the United States District Court for the Northern District of Texas seeking a declaratory judgment setting forth its obligations under the Policy with respect to the AIC Action (the "Prior Coverage Action").  (Id.)  Seghers and the other insureds under the Policy argued that the AIC Action involved multiple "Claims".  (Def. Br., at 6.)  In contrast, Executive Risk argued that the AIC Action constituted a single "Claim", and thus, was subject to a $5,000,000 liability limit.  (Id. at 7.)  The Prior Coverage Action was later consolidated with the AIC Action in the United States District Court for the Northern District of Texas.  (Compl., at ¶ 79.)

The Texas federal district court held, on March 11, 2004, that the  $5,000,000.00 liability limit applied to the AIC Action because the claims asserted therein were "Related Claims".  (Id. at ¶ 81; Def. Br., at 7-8.)  The court authorized Executive Risk to advance "Defense Expenses", as that term is defined in the Policy, to Seghers and the other insureds and explained that payment of such expenses would reduce the $5,000,000 liability limit.  (Def. Br., at 8; Compl., at ¶ 80.)

Disputes later arose among the various insureds over how the $5,000,000 liability limit should be allocated. (Def. Br., at 8.) Due to these disputes, the Receiver brought an action against

Seghers, Executive Risk and others in Texas state court seeking declaratory and injunctive relief with respect to the amount of coverage remaining under the $5,000,000 liability limit. (Compl., at ¶ 83.)  Specifically, the Receiver sought to enjoin Executive Risk from advancing Defense Expenses to Seghers and James Dickey, another defendant in the AIC Action.  (Def. Br., at 8.)  In a counterclaim, Executive Risk interpled the other parties claiming an interest in the remaining insurance proceeds. (<u>Id.</u> at 9.)

Seghers removed the Receiver's action to the United States District Court for the Northern District of Texas. (<u>Id.</u>) However, the parties reached an agreement shortly thereafter with respect to the remainder of the $5,000,000 liability limit. (<u>Id.</u>) Accordingly, the Texas state court entered an Agreed Final Judgment for Executive Risk Indemnity, Inc. on Interpleader and Discharge ("Agreed Final Judgment") on June 28, 2005, which (1) found that $4,000,000 of the applicable liability limit remains with respect to the AIC Action and all related claims, (2) directed disbursement of this amount in accordance with a separate distribution order, and (3) dismissed with prejudice and enjoined all coverage claims against Executive Risk arising from the AIC Action and its related claims.  (<u>Id.</u>)  The Agreed Final Judgment noted that Seghers and Executive Risk

> reserve their rights to contend and to have finally
> determined by a court of competent jurisdiction whether

9

> the SEC Actions, the Federal Criminal Action, and the
> BVI Matters . . . constitute Related Claims to the [AIC
> Action] under the policy, as well as to raise any other
> terms and conditions of the Policy with regard to the
> availability of coverage for the SEC Actions, the
> Federal Criminal Action, and the BVI Matters.

(Compl., at ¶ 85.)  The following day, the Texas state court

approved a settlement agreement among Executive Risk, the

Receiver, Seghers, Winifred Seghers, ER and ERM, which dismissed

all of the Receivers' causes of action against the other parties

in exchange for certain consideration, including a portion of the

$4,000,000 insurance proceeds.  (Id. at ¶ 84; Def. Br., at 9-10.)

The court also directed that the remaining insurance proceeds be

disbursed in accordance with the terms of its orders.  (Def. Br.,

at 9.)

## IV.  **This Action**

Plaintiffs assert here that the AIC Action, Receiver

Actions, SEC Actions, NFA Action, BVI Action, BVI FSC Action, and

the Criminal Investigations concern "clearly separate claims"

that have been asserted "in at least ten separate forums".

(Compl., at ¶ 81.)  Plaintiffs further assert that "each of these

actions involves different Claims, different alleged Wrongful

Acts, different complainants, different defendants, different

Insureds, different places, different times, different issues,

different attorneys, different laws and different remedies."

(Id. at ¶ 82.)  Accordingly, plaintiffs contend, inter alia, that

Executive Risk must pay them up to $5,000,000 pursuant to the

Policy for losses, Defenses Expenses, and settlement amounts incurred in connection with each of these separate actions, investigations, and proceedings until the policy limit of $25,000,000 is depleted.  (<u>Id.</u> at ¶ 103.)

### DISCUSSION

Executive Risk argues that transfer of this action is appropriate because (1) this action could have been brought in the Northern District of Texas, and (2) "the overwhelming majority of factors this Court must consider in order to prevent waste of time, energy, and judicial resources weigh strongly in favor of transfer." (Def. Br., at 12.)  Plaintiffs argue, however, that the actions, investigations, and proceedings underlying their claims in this action span one dozen jurisdictions, and New Jersey, the location of Executive Risk's principal place of business, rather than Texas, provides "a contractual center of gravity".  (Pls. Br., at 5.)

### I.    Transfer Standard

For "the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  An action might have been brought in another district, if (1) venue is proper in the transferee district, and (2) the transferee district can exercise jurisdiction over all the defendants.  <u>Shutte v. Armco Steel</u>

11

<u>Corp.</u>, 431 F.2d 22, 24 (3d Cir. 1970).  In a civil action where jurisdiction is based on Section 1332, venue can be laid in a judicial district (1) in which the defendants reside, if all defendants reside in the same state, (2) where a substantial part of the events or omissions giving rise to the claim occurred, or (3) where any defendants are subject to personal jurisdiction if there is no district in which the action otherwise might be brought.  28 U.S.C. § 1391(a).  A corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  28 U.S.C. § 1391(c).

The moving party bears the burden of demonstrating that the alternative forum is more appropriate than the present one.  <u>Jumara v. State Farm Ins. Co.</u>, 55 F.3d 873, 879 (3d Cir. 1995).  Courts balance various private and public interests when deciding whether to transfer pursuant to Section 1404.  <u>Jumara</u>, 55 F.3d at 879.  The private interests may include plaintiff's choice of forum, the ease of access to sources of proof, the availability of compulsory process over unwilling witnesses, the cost of attendance of willing witnesses, the possibility of a jury view of the premises, the location of books and records to the extent they may be unavailable in one forum, and whether the claim arose elsewhere.  <u>Id.</u>; <u>E.E. Cruz & Co. v. Alufab, Inc.</u>, No. 06-262, 2006 U.S. Dist. LEXIS 29706, at *17 (D.N.J. May 16, 2006).  The

public interests may include enforceability of the judgment, practical considerations that could make the trial easy, expeditious or inexpensive, relative administrative difficulty in the two fora resulting from court congestion, local interest in deciding local controversies at home, public policies of the fora, and familiarity of the trial judge with the applicable state law.  <u>Jumara</u>, 55 F.3d at 879-80; <u>Alufab, Inc.</u>, 2006 U.S. Dist. LEXIS 29706, at *17.

## II.  **The Transfer Standard Applied Here**

Transfer of this action to the Northern District of Texas is appropriate.  This action "might have been brought" in the Northern District of Texas because a substantial part of the events underlying this action occurred there.  Specifically, the majority of the actions and investigations for which plaintiffs seek insurance coverage under the Policy were commenced in Texas, including the AIC Action, two of the Receiver Actions, one of the SEC Actions, and one the Criminal Investigations.  Further, all of the actions, investigations, and proceedings discussed <u>supra</u> resulted from the alleged misconduct, omissions, and misrepresentations of (1) Seghers, a resident of Texas, and (2) ER, ERM and the nonparty hedge funds, which are all duly organized and existing under the laws of Texas and each has its principal place of business in Texas.  (<u>See</u> Compl., at ¶¶ 9, 12-13, 15-19.)  Thus, a substantial part of the events that form the

13

basis of plaintiffs' breach of contract and bad faith claims, as well as their requests for declaratory judgment and specific performance, occurred in Texas.

The Northern District of Texas can also exercise personal jurisdiction over Executive Risk because it transacts business there. (Def. Br., at 14.)  In fact, Executive Risk's claims manager and affiliate, Chubb & Son, handled all of the activity related to plaintiffs' insurance coverage requests at its Dallas, Texas offices. (<u>Id.</u> at 4.)  Further, the Northern District of Texas previously exercised personal jurisdiction over all of the parties to this action in the Prior Coverage Action.  Therefore, this action might have been brought in the Northern District of Texas because venue is proper there and it can exercise jurisdiction over Executive Risk.

Private and public interest factors also favor transfer of this action.  Although plaintiffs chose to bring this action in New Jersey, their choice of forum is entitled to less deference because a substantial part of the events and operative facts in this action did not occur in New Jersey and none of the plaintiffs reside here.  <u>See Sun Chem. Corp. v. Markem Corp.</u>, No. 05-2564, 2006 U.S. Dist. LEXIS 3469, at *6 (D.N.J. Jan. 30, 2006) (stating that plaintiff's choice of forum was entitled to less deference because a substantial portion of the operative facts did not occur in that forum); <u>Agrotors, Inc. v. Bell Helicopter</u>

14

Textron, Inc., No. 03-4345, 2004 U.S. Dist. LEXIS 3641, at *11 (E.D. Pa. Mar. 8, 2004) ("[A] plaintiff's choice of forum, while usually of paramount importance, is accorded less deference where . . . the plaintiff does not reside in the forum chosen and no operative facts occurred in the forum."); LG Elecs. v. 1st Int'l Computer, Inc., 138 F.Supp.2d 574, 590 (D.N.J. 2001) ("When the central facts of the lawsuit occur outside the forum state, a plaintiff's selection of that forum is entitled to less deference.")

None of the actions, investigations, and proceedings that underlie plaintiffs' requests for coverage under the Policy were commenced in New Jersey.  In contrast, several of the actions and investigations were brought in Texas.  Moreover, the Policy was underwritten in Connecticut, issued to a Bermuda policyholder, and brokered by a London firm.  (Def. Br., at 4.)  All matters pertaining to plaintiffs' coverage requests were handled at the offices of Executive Risk's affiliate in Dallas, Texas.  Further, an Executive Risk claims representative located in Dallas, Texas made the determination that the actions, investigations, and proceedings discussed supra constitute "Related Claims" subject to a single $5,000,000 liability limit, which led plaintiffs to commence this action.  (Id. at 19.)  Accordingly, the claims underlying this action did not arise in New Jersey.

15

The location of books and records also weighs in favor of transfer.  The underwriting file for the Policy is located in Connecticut.  (Id. at 22.)  Executive Risk's claims-handling files are located in Texas, and these files may be needed in this action because they document requests for coverage and Executive Risk's processing of those requests.  (Id. at 4.)  Also, the majority of the actions and investigations underlying plaintiffs' claims against Executive Risk were commenced in Texas, and thus, the pleadings, orders, and other documents related to those actions and investigations, which may be necessary to determine whether they constitute "Related Claims", are located in Texas. Given that plaintiffs have not asserted that any potentially relevant documents are located in New Jersey, this factor weighs in favor of transfer.

This action primarily involves the interpretation of the Policy's applicable terms and provisions and application of those terms and provisions to plaintiffs' claims.  Accordingly, because this action will require little, if any, witness testimony, neither the convenience of witnesses nor the cost of attendance of unwilling witnesses weighs heavily for or against transfer. (See id. at 20; Pl. Br., at 16-17.)  Similarly, no local issues are implicated here, and thus, neither Texas nor New Jersey has a local interest in deciding this action.  Moreover, the parties have not addressed whether court congestion in the Northern

16

District of Texas, the enforceability of a judgment, or any public policies of this district or the Northern District of Texas weigh in favor of keeping this action here or transferring it.  The familiarity of the trial judge with applicable state law also does not weigh in favor of keeping this action in this district or transferring it because this case does not involve any novel or difficult applications of state law

Practical considerations, however, indicate that transfer would make resolution of this action more expeditious by eliminating any delays caused by this Court needing to familiarize itself with the relevant Policy provisions and the facts and circumstances surrounding the parties' dispute. Transfer of this action to the Northern District of Texas would promote judicial efficiency because that district has already familiarized itself with the Policy and the parties' conflicting interpretations of its applicable provisions in rendering its decision in the Prior Coverage Action.  Also, four of the five plaintiffs is located in Texas and all of the parties recently litigated the Prior Coverage Action there.  Further, the Receiver, who represents the interests of the nonparty hedge funds that are also insureds under the Policy, resides in Texas. Executive Risk may have its principal place of business in New Jersey, but it has asserted that it is financially capable of litigating this action in the Northern District of Texas.  (Def.

Br., at 19.)  Accordingly, both plaintiffs and Executive Risk are familiar with the Northern District of Texas and will not be either physically or financially burdened by continuing this action there.  Therefore, balancing the various factors, this Court finds that the Northern District of Texas is a more appropriate forum.

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant the motion, and (2) transfer this action to the Northern District of Texas.  The Court will issue an appropriate order and judgment.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge